COMMONWEALTH *vs.* CHARLES J. KILEY, JR.

Suffolk.     May 6, 1977. — September 30, 1977.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, KAPLAN, & LIACOS, JJ.

*Practice, Criminal,* Directed verdict, Double jeopardy, Duplicitous convictions. *Bank,* Misapplication by bank officer. *Constitutional Law,* Double jeopardy. *Evidence,* Business record.

At the trial of indictments under G. L. c. 266, § 53A, evidence that the defendant, who had been president of a bank, intentionally contrived to have another individual sign for loans being made for the benefit of the defendant, that he knew that the collateral provided by the borrowers was nonexistent and not owned by them, that certain securities pledged by the borrowers as collateral security were never received by the bank, that the defendant caused certain persons to be recorded as borrowers when he himself was the beneficiary of the loans, and that he knowingly caused to be made entries as to nonexistent collateral warranted findings that the defendant had wilfully misapplied the bank's funds, that he knew at the time of each loan that the borrower's assets were less than the borrower's liabilities, that he had received and accepted, as security for loans, fictitious, valueless, inadequate and irresponsible obligations, and that he knowingly made and caused to be made false statements in the bank's books. [456-461]

Separate indictments charging four distinct violations of c. 266, § 53A, arising from one transaction did not violate principles of double jeopardy where each offense charged required proof of distinctive and additional facts. [461-462]

At a criminal trial, the judge did not err in admitting in evidence under the provisions of G. L. c. 233, § 78, the factual entries on certain documents prepared by an independent firm of auditors where the records were sufficiently qualified by an appropriate witness. [462]

At a criminal trial, there was no error in the denial of a motion to dismiss each indictment on the ground that testimony given by an attorney before the grand jury concerned matters that were confidential and protected by the attorney-client privilege where evidence warranted a finding that no attorney-client relationship existed. [462]

INDICTMENTS found and returned in the Superior Court on December 12, 1973.

The cases were heard by *McGuire,* J.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*John P. White, Jr.,* for the defendant.

*Wade M. Welch,* Special Assistant Attorney General (*Donald P. Zerendow,* Assistant Attorney General, with him) for the Commonwealth.

HENNESSEY, C.J.    After a trial before a Superior Court judge without jury, the defendant was found guilty on twelve indictments, and on all of the ninety-three counts contained therein, charging violations of G. L. c. 266, § 53A. All charges concerned twelve loans from the Brighton Five Cents Savings Bank (Brighton Five) to Merlin R. Fisher, Jr. (Fisher), six loans to Cirt Research, Inc. (Cirt), of which Fisher was president, and six loans to Octal Realty Inc. (Octal), of which Fisher was president. All loans were alleged to have occurred from on or about October 10, 1969, to on or about July 16, 1971. During all this time the defendant was president of the Brighton Five.

The violations charged were three indictments for wilful misapplication of bank funds in connection with the loans to Fisher, Cirt, and Octal; three indictments for knowingly receiving and accepting fictitious, valueless, inadequate and irresponsible obligations from Fisher, Cirt, and Octal; three indictments for loaning the funds and credits of the Brighton Five to Fisher, Cirt, and Octal when the defendant knew each to have insufficient assets; and three indictments for knowingly making and causing to be made false entries on the bank's books, reports, and

statements in connection with the loans to Fisher, Cirt, and Octal.[1]

The defendant was found guilty on all indictments and counts and received a sentence of five years to the Massachusetts Correctional Institution at Concord on each count of the indictments, the sentences to be served concurrently. His appeal is here under G. L. c. 278, §§ 33A-33G. We conclude that there was no error.

1. Trial of the action consumed more than four weeks, and generated hundreds of transcribed pages of testimony. Most of the testimony concerned the details of the twenty-four loans which were the subject matter of the indictments.

The defendant argues that the evidence did not warrant findings of guilty on the ninety-three counts, and that it was error for the judge to deny the defendant's motions addressed to the insufficiency of the evidence. We disagree. The evidence was sufficient as to all indictments and all counts. As to this issue, we consider only the evidence heard by the judge up to the time the Commonwealth rested its case in chief. See *Commonwealth* v. *Kelley*, 370 Mass. 147, 149-150 (1976).

In 1968, the defendant worked in Binghamton, New

---

[1] The material words of G. L. c. 266, § 53A, as appearing in St. 1956, c. 297, are as follows: "An officer, director, trustee, agent or employee of a bank...who wilfully misapplies...any of the moneys, funds, credits or other property of such bank;...or who loans the funds or credit of such bank to any individual, corporation, joint stock company, trust, association or partnership when the assets of such borrower are known by such officer, director, trustee, agent or employee to be less than all the liabilities of such borrower other than debts subordinated to such loan, unless such loan is adequately secured or is necessary for the protection of existing loans; or who knowingly receives or accepts for such bank any fictitious, valueless, inadequate or irresponsible obligation directly or as security or endorsement unless the consideration or security is otherwise sufficient, or unless it shall be necessary to prevent loss upon a debt previously contracted in good faith;...or who knowingly makes or causes to be made any false entry in any book, report or statement of such bank...shall be punished by a fine of not more than ten thousand dollars or by imprisonment in the state prison for not more than ten years, or in a jail or house of correction for not more than two and one half years, or by both such fine and imprisonment."

York. Fisher, whom the defendant had known since 1956 and with whom he had a social relationship, worked in a position subordinate to the defendant. In the fall of 1968, the defendant's brother Edward became president of the Brighton Five, his father having been president previously. In 1968, Fisher's salary was approximately $12,000 a year.

In the summer or fall of 1968, the defendant advised Fisher of the availability for purchase with no money down of accounts receivable and suggested formation of a corporation. Fisher then formed Cirt Research, Inc. These accounts receivable were "bad debts" of the Brighton Bank and Trust Company. Fisher testified that the defendant arranged for Cirt to purchase such accounts receivable, but that Fisher had never collected more than $15,000 on them and had ceased collecting about June, 1969. Fisher testified that an attorney, Mr. Henry M. Quinlan, had done some collecting thereafter, but Fisher did not know how much was collected. Fisher said that the defendant claimed to him to have collected $100,000 but Fisher knew nothing further about it and had no records to show it. Nothing in Cirt's records authorized the defendant to do anything.

In late July, 1968, the defendant became aware through his brother Edward of the availability for purchase of the Riviera Beach Motel in South Yarmouth. The defendant asked Fisher if he wanted to buy the motel, and advised him that the Brighton Five would finance 100% of the purchase price plus additional money for renovation and working capital. The motel was closed in the winter. It was purchased by three trusts on August 30, 1968: the 22 Wightman Drive Realty Trust, Merlin R. Fisher, Jr., trustee; the 112 Gilmore Avenue Realty Trust, one John E. McEnaney, trustee; and the 77 Schubert St. Realty Trust, one James J. McKeown, trustee. Fisher put no money of his own into any of these trusts. He claimed that he and his wife owned the trusts or, alternatively, that Octal owned the trusts, but he had no evidence or records to show it. The purchase price for the motel was approximately $1,000,000. The funds were obtained from three

mortgages of approximately $400,000 each from the Brighton Five. The mortgage financing had been arranged by the defendant. During 1969, the motel income was insufficient to meet expenses including mortgage debt. Fisher testified that additional funds were bank wired "from Boston" to the account of Octal in Binghamton, New York, so that mortgage payments could be made. During this period, Fisher was sending the defendant progress reports on the motel and discussed his bank balances with the defendant. During the summer of 1969, Fisher delivered to the defendant checks signed by him and drawn on a general account of the motel with the amount and payee left blank.

Fisher testified that in September or October, 1968, the defendant advised him to form a corporation to "hold" the Riviera Beach Motel. Octal Realty Inc. was formed about that time.

The corporate records of Cirt and Octal indicate that 900 shares of both Cirt and Octal stock were issued to Fisher and 100 shares of stock in each corporation to James J. McKeown. The president and treasurer of both Cirt and Octal was Fisher. His wife, Edna M. Fisher, was the only other officer of either corporation. Both corporations opened an account in the First City National Bank of Binghamton, New York. Merlin and Edna Fisher were the authorized signatures for both of these accounts. Fisher testified that there was no capital investment made in either corporation, that neither Cirt nor Octal had a corporate office, that the only corporate records of either corporation other than the initial formation papers and minutes were the checkbooks of Cirt and Octal which he maintained, and that, except for a savings account in the name of Octal at the Brighton Five, neither Cirt nor Octal had any other bank account. Fisher also testified that the defendant acted as his adviser as to the business of both corporations. Fisher testified that he had no knowledge as to the whereabouts of the stock certificates issued by either corporation. On cross-examination, Fisher agreed that for practical purposes he was Octal and Cirt.

On March 10, 1969, the defendant became president of the Brighton Five. In June of that year Fisher moved to Cape Cod to manage the Riviera Beach Motel. Title to the Cape Cod house was in Fisher's wife's name. Aside from the 900 shares of Cirt and the 900 shares of Octal, he had no stockholdings.

The twenty-four loans detailed in the indictments were shown on bank records to be secured by collateral in form of stocks and bonds, posted by the borrowers. The evidence showed that Fisher, Cirt, and Octal did not own the collateral. The defendant personally handled all the transactions for the bank. By these loans hundreds of thousands of dollars of the bank's money were obtained. This was diverted, not to the "borrowers," but to the defendant. There was evidence that the defendant diverted some of the money to pay for renovations to the Riviera Beach Motel, as well as the mortgage payments owed to Brighton Five on the motel. There was also evidence that the defendant used some of the money to buy securities on the stock market for Fisher, as authorized by Fisher. There was evidence from which the judge could infer that Fisher never became the owner of any of the stock allegedly purchased. There was evidence that the bank's board of investment knew nothing about these loans.

From this and other evidence the judge could infer that the defendant, as alleged in some of the indictments, in the language of G. L. c. 266, § 53A, "wilfully misapplie[d]" the funds of the bank. The evidence warranted a finding beyond a reasonable doubt that the defendant contrived to have Fisher sign for loans supposedly made to Fisher, Cirt, and Octal; that this method was followed to hide from other bank employees and officials the fact that the loans were being made for the benefit of the defendant. The making of loans by Brighton Five to its president was forbidden by law. G. L. c. 168, §§ 19, 20. Such conduct constitutes misapplication and, since it was done intentionally and by design of the defendant, was wilful in nature. *Commonwealth* v. *Nichols*, 257 Mass. 289, 298 (1926).

We add that it is not material that the defendant also

claimed to have diverted some of the proceeds of the loans to pay amounts due to Brighton Five on other "bad loans" of certain unnamed mortgagors. Even if the judge accepted this contention as true, and as indicative of an unselfish purpose of the defendant, it was not essential in proof of the offense to show that the defendant acted maliciously or with criminal design. *Commonwealth* v. *Nichols, supra* at 298.

Certain other indictments charged, in terms of the statute, c. 266, § 53A, that the defendant knew at the time of each loan that the borrower's assets were less than the borrower's liabilities. The evidence warranted an inference that the defendant was aware that the borrowers, Fisher and the two corporations, were merely straws and conduits for the diversion of bank money to the defendant himself; that the "collateral" supposedly provided by the borrowers was nonexistent and not owned by them; and that the borrowers at no time had assets comparable to the moneys loaned to them.

Other indictments charged in statutory language that the defendant received and accepted for Brighton Five, as security for loans, fictitious, valueless, inadequate and irresponsible obligations. Clearly the evidence warranted conclusions that the notes given by Fisher, Cirt, and Octal were inadequate and irresponsible, and that the defendant knew this to be true. There was evidence also that warranted conclusions that certain securities supposedly pledged by the borrowers as collateral security for the notes were never received by the bank.

Finally, the evidence warranted findings that the indictments were proved which charged that the defendant knowingly made and caused to be made false statements in the books of Brighton Five relating to the various loans. The defendant was personally in charge of the loans for the bank and it was sufficient to show, as the Commonwealth did, that he caused Fisher, Cirt, and Octal to be recorded as borrowers when it was the defendant himself who received the money and was the beneficiary. Further,

the evidence supported conclusions that the defendant knowingly caused to be made entries as to nonexistent collateral.

In summary, the evidence presented by the Commonwealth in its case in chief, considered together with its reasonable inferences, was sufficient to show, and indeed did show by persuasive evidence, the defendant's guilt as to all ninety-three counts of the indictments and the four types of distinct statutory offenses charged in the indictments.

2. The defendant contends that there was error in the denial of his "Motion to Elect" based on double jeopardy grounds. The essence of the argument is that four distinct violations of G. L. c. 266, § 53A, were charged as to each business transaction and that the judge should have ordered the Commonwealth to proceed as to one alleged crime only, as to each transaction. There was no error.

It is true that the protection of double jeopardy principles generally forbids two or more punishments for the same crime. It is possible, however, for one act to violate two separate statutory provisions. The test is whether each statutory offense requires proof of an additional fact which the other does not. If so, acquittal or conviction under either statute does not exempt the defendant from prosecution and conviction under the other. *Kuklis* v. *Commonwealth,* 361 Mass. 302, 305-308 (1972). *Morey* v. *Commonwealth,* 108 Mass. 433 (1871). It is clear beyond the necessity for further discussion that at least one distinctive and additional fact had to be proved for conviction of each of the several crimes alleged: misapplication of funds; receiving fictitious and inadequate obligations; knowingly making or causing to be made false entries in the bank's records; loaning funds to a borrower known to have insufficient assets.

We need not consider the Commonwealth's further and persuasive argument that principles of double jeopardy or "two punishments" (see *Kuklis, supra* at 305) are not applicable here because the sentences as to the ninety-three

convictions were concurrent. See *Green* v. *United States,* 274 F.2d 59, 61 (1st Cir. 1960), *S. C.* 365 U.S. 301, 306 (1961).

3. There was no error in the judge's admitting in evidence, as business records under G. L. c. 233, § 78, the factual entries on certain documents prepared by an independent firm of auditors. The records were sufficiently qualified by an appropriate witness; it is not necessary to show personal knowledge or personal participation by the witness as to each of the entries. See *Sawyer & Co.* v. *Southern Pac. Co.,* 354 Mass. 481, 484 (1968). The case of *Kelly* v. *O'Neil,* 1 Mass. App. Ct. 313 (1973), relied on by the defendant, is clearly distinguishable.

We have examined the several other assignments of error relating to rulings by the judge as to evidentiary matters, and we find no error.

4. Prior to trial the defendant filed a motion to dismiss each indictment on the ground that testimony given by Mr. Henry M. Quinlan, an attorney, before the grand jury concerned matters that should have been confidential and protected by the attorney-client privilege. Mr. Quinlan did not testify at the trial. The judge denied the motion to dismiss on the ground, inter alia, that no attorney-client relationship existed between the defendant and Mr. Quinlan. Since the evidence clearly warranted that finding, we conclude that there was no error. We need not consider further difficulties, perhaps insurmountable, which the defendant would have in meeting the judge's further findings and rulings that, if the attorney-client relationship had existed, the communications of the defendant to Mr. Quinlan would not be protected since the talk concerned "the proposed commission of a crime by the client." See *Commonwealth* v. *Dyer,* 243 Mass. 472, 505-506 (1922), cert. denied, 262 U.S. 751 (1923).

*Judgments affirmed.*