Pamela CRAIG, Plaintiff, Appellee,

v.

A.H. ROBINS CO., INC.
Defendant, Appellant.

No. 85–1241.

United States Court of Appeals,
First Circuit.

Argued Feb. 4, 1986.

Decided April 30, 1986.

Richard L. Neumeier, with whom Rebecca J. Wilson and Andre A. Sansoucy, Parker, Coulter, Daley & White, Boston, Mass., were on brief for defendant, appellant.

Robert V. Costello, Schneider, Reilly, Zabin, Connolly & Costello, and Neil Rossman, with whom Norine Philipp, Rossman & Rossman, P.C., Boston, Mass., were on brief, for plaintiff, appellee.

Before COFFIN and BOWNES, Circuit Judges, PETTINE, Senior District Judge *.

COFFIN, Circuit Judge.

This case involves a female plaintiff's products liability suit against A.H. Robins Co., the manufacturer of the "Dalkon Shield", an intrauterine device (IUD). In the court below a jury awarded plaintiff a verdict of $450,000 for injuries caused by defendant's negligence. Defendant's appeal challenges several trial rulings as erroneous. We conclude that none constituted reversible error.

The first issue concerns the trial court's exclusion of proffered testimony of two of defendant's experts that plaintiff's own sexual history may have accounted for the injuries she attributed to the Dalkon Shield. Prior to trial plaintiff had moved to forestall any cross-examination or introduction of evidence with respect to her having had sexual relationships with men other than her husband on the grounds that her sexual history was irrelevant to the issues and that such could only prejudice her in the eyes of the jury. The motion was allowed "at this time".

The evidence ultimately placed before the jury revealed that a Dalkon Shield was first inserted in plaintiff on November 19, 1971; that in 1974, 1975, and 1979 she complained of discharges and discomfort to various doctors; and that the Dalkon Shield was removed on May 16, 1979. She met her future husband in 1980, and experienced a defective pregnancy, which required removal of her right ovary and right fallopian tube. She married on September 26, 1981. A deposition of plaintiff revealed that, during the period beginning six months before insertion of the Dalkon Shield (i.e., May, 1971) and ending when it was removed (May, 1979), she had fifteen sex partners, and five more between 1979 and 1982.

Defendant's attempts to exploit plaintiff's sexual history were the following. On the fourth day of trial, plaintiff's expert, Dr. Tatum, testified on cross-examination that the risk of a woman getting pelvic inflammatory disease increased if she had multiple sex partners "over a limited time span" (Tr. 346).[1] On plaintiff's objection, the defendant was foreclosed from pursuing this questioning, the court pointing out that "multiple", which seemed to depend on the time period, had not been defined.

Subsequently, on the tenth day of trial, defendant introduced the deposition of Dr. Perlmutter, an expert witness in another case whom plaintiff had planned to, but did not, call. The purpose was to lay a foundation for either cross-examining plaintiff or introducing part of her deposition as to her sexual history. But the doctor, in the course of her sixty-three page deposition, identified multiple sex partners as a factor enhancing the risk of contracting pelvic inflammatory disease only when they occurred in the same general period of time. (A. 248, 249). Accordingly, the court refused to permit testimony concerning the effect of having "multiple sex partners" because of the absence of evidence that plaintiff during any one such period had several partners. (Tr. 651h).

At this point, on the twelfth day of trial, defendant made another offer of proof, adding the affidavits of two doctors, Adamsons and Evrard, to the effect that "with or without the use of an IUD, a woman increases the risk of having pelvic inflammatory disease with every sexual contact, regardless of whether the sexual partners are concurrent or successive, or whether or not the time period over which she has

---

* Of the District of Rhode Island, sitting by designation.

1. In its brief to this court, defendant acknowledged that this testimony was "rather equivocal". Unpardonably, defendant asserted "[b]y contrast the defendant's experts were of the view the plaintiff's experience of fifteen sexual partners with the Dalkon Shield and twenty

overall was 'a more significant risk factor by far than the use of any IUD.'" *The quotation is from trial counsel, not a witness. The record reference to affidavits of defendant's experts signals nothing stronger than that the sexual history was "a greater risk factor ... than her IUD use."* (A. 304, 307).

these partners is extended." (A. 304, 306). The court ruled, after observing that this offer conflicted with the prior offer, that "the subject matter is now so hazy in terms of persuasiveness ... that insofar as there may be any probative value ... the prejudicial impact would outweigh the probative value." (Tr. 651i).

We cannot say that the court abused its discretion. When the defendant changed its proffer (because of the absence of a factual foundation) from testimony addressed to the effect of having a number of sexual partners during the same period of time to a proffer that unquantified increased risk arose from having concurrent or sequential partners over any period of time, however extended, the probative/prejudicial calculus drastically changed. The offer of proof contained no basis for such an open-ended assessment of risk, as applicable to one partner a decade, or to ten or a hundred. Whatever the probative value, the court cannot be faulted for deeming such an assessment to be disproportionately prejudicial. Although the jury could infer from the evidence of plaintiff's medical history and use of contraceptives that she had sex partners prior to her husband, the proferred expert testimony would likely have led to a lengthy focus on the number, sequence, and frequency of partners out of all proportion to any medically significant evidence of increased risk.

The second error claimed and argued in defendant's brief (but not in oral argument) is that the court erred in admitting excerpts from a deposition, taken in another suit[2] against defendant, of one Tuttle, who had worked as an in-house attorney for defendant and had since been discharged. His responsibilities included Dalkon Shield litigation. His deposition testimony was to the effect that in 1975, after the first lawsuit to result in punitive damages, defendant's general counsel ordered the destruction of many internal documents relating to the Dalkon Shield; that

Tuttle's job was to review the documents selected for destruction; that he saved a number of them; that they related both to the product's efficacy (e.g., a record of pregnancies by users that gave rise to concern) and safety (e.g., an early concern over the "wicking" tendency of the Shield's tail; and a concern over the possibly deleterious effects of the surreptitious addition of copper sulfate to the device).

The defendant, before trial, filed a list of some three hundred objections it had made to Tuttle's deposition testimony and a second list of a roughly equal number of objections that it was making for the first time. The district court responded by adopting the rulings of Magistrate Cudd, who presided over and made evidentiary rulings during Tuttle's Minnesota deposition.

Defendant's first type of objection is that "many, if not most" of Tuttle's statements as to conversations with defendant's personnel invaded defendant's attorney-client privilege. (Brief, p. 25). The second, and related, type is that "[s]everal times during his deposition, Tuttle was asked for his opinions on ... liability ... as well as his reaction to evidence testimony and information...." (Brief, p. 27) and that his answers should have been excluded as protected work product.

Under these circumstances, where literally hundreds of evidentiary rulings have been bundled up in huge bales and placed on our doorstep, we do not feel called on to perform a minute scrutiny. It suffices for us to note that in somewhat over twenty-five pages of colloquy (A. 507–533), Magistrate Cudd considered defendant's arguments at some length and ruled that the plaintiff had made a prima facie case (A. 532) that there had been a "deliberate studied" (A. 521) destruction of documents in 1975 with a continuing impact (A. 526), affecting the instant lawsuit, such as to bar the invocation of an attorney-client privilege.

---

2. *Mary Bonlender v. A.H. Robins Co.,* Civ.Act. No. 3–80–341, United States District Court, District of Minnesota, Fourth Division.

We note with considerable skepticism the fact that defendant's argument in support of its claim of error consists of a brief discussion of the attorney-client privilege and the principles underlying it, while scrupulously avoiding any mention of the crime-fraud exception, i.e., the principle that attorney-client consultations to further a crime or fraud are not privileged, *Commonwealth v. Kiley*, 373 Mass. 454, 462, 367 N.E.2d 837 (1977); *see also* 8 C. Wright & A. Miller, *Federal Practice and Procedure* § 2017, at 134 (1970). Defendant singled out a handful of trial court rulings on attorney-client privilege to support its claim of error. Some resulted in no evidence adverse to defendant. (Tr. 233). The others fall into the following categories: conversations regarding the adverse impact on defendant's financial status and its defense of lawsuits if the Dalkon Shield were to be recalled (Tr. 137, 142–44, 151, 160); and testimony concerning defendant's misrepresenting to the public both the possible relationship between use of the Dalkon Shield and pelvic inflammatory disease (Tr. 229) and the frequency of pregnancies experienced by Dalkon Shield users (Tr. 193–96, 173–76). They form part of a pervasive picture of covering up a defective product and continuing to merchandise it by misrepresenting both its efficacy and its safety. There was no error in allowing this testimony.

Closely related is defendant's work product claim. Indeed many objections were framed in both attorney-client and work product terms. The sampling of allegedly erroneous admissions of work product testimony cited by defendant included some instances where the objection was not framed in work product terms but rather in terms of vagueness (Tr. 56–57) or lack of medical expertise (Tr. 72), both rulings being clearly within the court's discretion. Some evidence admitted over objection could not be said to be prejudicial. (Tr. 142) The other instances depicted such fraudulent activity as the dishonest selectivity of data (Tr. 173); an improper refusal to recall the product (Tr. 144); a dishonest representation as to pregnancy rate experi-

ence (Tr. 195–96); the concealment of the wicking possibility of the Shield (Tr. 207), and of a user's pregnancy terminating with a stillborn child (Tr. 250); and a deliberate refusal to disclose information to government agencies (Tr. 267). We agree with the Second Circuit that this kind of continuing fraudulent misrepresentation and cover-up vitiates not only any attorney-client privilege but also any work product immunity. *In re John Doe Corp.*, 675 F.2d 482, 492 (2d Cir.1982).

Defendant asserts two other kinds of errors in admitting Tuttle's deposition testimony, one consisting of impermissible references to defendant's insurance carrier and meetings therewith, and the other being testimony regarding other claims for injuries allegedly caused by the Dalkon Shield. We have meticulously checked every cited reference to the record and find that no "insurance" or "other claims" objection was timely made, either before Magistrate Cudd or in the subsequent catalogue of supplemental objections. Occasionally we found other kinds of objections on the cited pages, such as lack of foundation as an expert (Tr. 72) or "argumentative" (Tr. 253), or the kind of objection we have already dealt with, e.g., work product (Tr. 159, 160, 249) and attorney-client privilege (Tr. 160, 162, 246, 249), but we found no basis for the arguments made on appeal. We therefore hold that these two issues were simply not preserved.

█ One final assertion of error has to do with the admission of deposition testimony of one Crowder, a Quality Control Supervisor of a subsidiary of defendant, which assembled and packaged the Dalkon Shield. Crowder testified that he felt the Shield had a design flaw and, to demonstrate it, he performed a simple test to show that the Shield could wick fluid. He further testified to the angry remonstrances of his superior when confronted with the test results. Defendant argues that the state of mind of Crowder's superior was irrelevant to the issues of negligence or breach of warranty—both dealing with objective standards. But, as the trial court

concluded, an angry and arbitrary response of defendant's key officials might properly justify a jury in inferring either that defendant had full knowledge of its product's defects or deliberately wished to shut itself off from such knowledge. (A 335). Such a knowledge of risk is germane to the due care or lack of such of promoting such a product.

*Affirmed.*