USCA1 Opinion

 

 United States Court of Appeals For the First CircuitNo. 98-1214  ANITA BAKER, Plaintiff, Appellee, v. DALKON SHIELD CLAIMANTS TRUST, Defendant, Appellant. APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Joseph L. Tauro, U.S. District Judge]  BeforeSelya, Boudin and Lipez, Circuit Judges.   Paul F. Strain with whom Terri L. Turner, Venable, Baetjer andHoward, LLP, Richard A. Oetheimer and Goodwin, Proctor & Hoar LLP were on brief for appellant. Robert V. Costello with whom Schneider, Reilly, Zabin &Costello, P.C., Neil Rossman and Rossman, Rossman & Eschelbacherwere on brief for appellee.September 23, 1998   BOUDIN, Circuit Judge. Dalkon Shield Claimants Trust(the "Trust") appeals from a judgment in favor of Anita Baker fordamage allegedly caused by the Dalkon Shield contraceptiveintrauterine device (the "IUD"). The background facts, drawn fromthe trial record, are largely undisputed. In October 1972, AnitaBaker underwent a routine gynecological examination that revealedthat she had a slightly enlarged right ovary and that trichomonas,a sexually transmitted organism, was present in her Pap smear. Baker had a Dalkon Shield IUD inserted in July 1973 and removed inSeptember 1974 after suffering severe discomfort. In October 1974, Baker went to obstetrician/gynecologistDr. Miles St. John. He examined Baker and fit a diaphragm for her. In the course of his examination, he noted hardness and slightirregularity in the uterus. His diagnosis was that it could havebeen caused by pelvic inflammatory disease ("PID") or by a fibroidtumor or by endometriosis. Concerned about this development, heasked Baker to return for a follow-up visit in three months. InJanuary 1975, Baker returned to Dr. St. John; he reexamined her andconcluded that the problem had resolved itself. He also askedBaker to return in six months but she did not do so. In January 1979, Baker had a laparoscopy--a visualinspection through a scope--to determine why she was havingdifficulty conceiving. The procedure revealed that Baker had afibroid tumor in her uterus and adhesions in her left and rightfallopian tubes. It also indicated damage consistent with PID. InFebruary 1979, she underwent exploratory and reconstructive surgerythat confirmed that her infertility was due to PID. In December1979, Baker underwent extensive reconstructive surgery andmicrosurgery on her reproductive organs. Sometime later, after anectopic pregnancy, Baker had her right fallopian tube removed andher left fallopian tube sealed. In 1980, Baker filed a complaint against A.H. RobinsCompany, Inc. in the district court for negligence, breach ofwarranty, and fraud, claiming that the Dalkon Shield IUD wasresponsible for her PID and subsequent infertility. There ensueda substantial delay due to the bankruptcy of A.H. Robins, theestablishment of the Trust, and the processing of Baker's claimthrough the Trust's claims settlement process. In January 1995,Baker was certified by the bankruptcy court in charge of the A.H.Robins bankruptcy to reopen the case and proceed with litigation. The aspect of that case that concerns us on this appeal relates tochlamydia, a sexually transmitted disease now widespread in theUnited States. In 1996, two chlamydia titer tests were performed upon asample of Baker's blood. One was performed at the Trust'srequest, the other at Baker's. Both titer tests were positive forchlamydia, indicating that Baker had been infected by chlamydia atsome earlier time. This was of importance to the defense because--in addition to disputing that Dalkon Shield IUDs could cause thePID and the effects claimed by Baker--the Trust planned to point tochlamydia as an alternative, exculpatory cause of her injury. In October 1997, immediately before the trial, Bakermoved in limine to exclude the evidence of the two 1996 chlamydiaantibody titer tests as remote in time and unduly prejudicial. Insupport of their admissibility, the Trust submitted an affidavit byDr. Mary Jane Minkin, a gynecologist. Dr. Minkin's affidavitexplained that the medical community considered titer tests reliable evidence of prior infection by chlamydia and thatchlamydia is the most common cause of the type of PID that theTrust claimed that Baker had suffered. The trial court postponedits ruling on the admissibility of the titer test evidence until avoir dire of the Trust's experts could be conducted. Trial began in November 1997. Since the Trust's expertswere not immediately available, the district court first allowedthe Trust to assert in opening argument its intention to offerevidence in support of its alternative causation theory, namely,that Baker's PID was caused by chlamydia. The district court alsoallowed the Trust to cross-examine Baker's first witness,gynecologist Dr. St. John, regarding the Trust's alternativecausation chlamydia theory. On the second day of trial and outside the presence ofthe jury, the district court heard the voir dire testimony of Dr.Richard Jones, another of the Trust's expert gynecologists. Dr.Jones explained (as more fully set forth below) why he believedthat Baker's PID had been caused by chlamydia and not by the IUDand why the positive 1996 chlamydia titer tests reinforced hisopinion. Following the voir dire testimony, the district courtgranted Baker's motion to exclude any reference by Dr. Jones tochlamydia or the 1996 titer tests. The district judge said that the opinion Dr. Jones hadpresented in voir dire regarding the alternative causationchlamydia theory "strikes [the court] as being nothing more than aguess." In later references to this issue, which recurredthroughout the trial in relation to different pieces of evidence,the district court stated that there was no "basis" for discussingthe theory. On one occasion, the court remarked that the evidencerelating to chlamydia was more prejudicial than probative andsuggested that direct testimony by Dr. Jones on this topic would"inject . . . sexual innuendo" into the trial. Thereafter, the district court barred the Trust'sexperts, Drs. Jones and Minkin, from testifying about chlamydia,and barred the Trust's counsel from cross examining Baker'sprincipal medical expert, Dr. Phillip Stubblefield, on the issue ofchlamydia as an alternative cause of the PID. By closingarguments, the district court had completely barred the Trust'scounsel from mentioning the word "chlamydia," and restrictedcounsel from referring either to his earlier cross examination ofDr. St. John on chlamydia or to Baker's medical records regardingthe trichomonas that appeared in the 1972 Pap smear, both of whichwere already in evidence.  Prior to reaching a verdict, the jury asked the districtjudge several questions about the medical records in evidence thatdescribed the presence of trichomonas in 1972. These questionsappeared to refer to the issues surrounding the Trust'salternative-causation argument based on chlamydia. Followingdeliberations, the jury returned a verdict for Baker on the issueof causation and awarded damages of $175,000. The district court entered a judgment for $175,000 indamages and $365,802.73 in prejudgment interest. The Trust movedto modify the judgment by striking the prejudgment interest on theground that the United States Bankruptcy Court for the EasternDistrict of Virginia had sole jurisdiction over whether prejudgmentinterest could be awarded to Dalkon Shield plaintiffs under theA.H. Robins Co., Inc. plan of reorganization. The motion wasdenied by the district court. This appeal followed. In this court, the Trust argues that the district courtcommitted reversible error in effectively excluding its entirealternative causation defense from trial, by restricting or barringdirect expert opinion testimony, by excluding scientific evidence,and by limiting cross examination of plaintiff's expert witnesses. The Trust also argues that the district court improperly awardedprejudgment interest. We agree on the first point and remand fora new trial; on the second point, Baker now is contending that theissue should be resolved in accordance with the decision in arelated Fourth Circuit case. The trial court has broad discretion in determiningissues of admissibility of expert testimony and scientificevidence, see United States v. Shay, 57 F.3d 126, 132 (1st Cir.1995), as well as in ruling on specific questions regarding crossexamination of witnesses, see Nickerson v. G.D. Searle & Co., 900F.2d 412, 421 (1st Cir. 1990). In Daubert v. Merrell DowPharmaceuticals, Inc., 509 U.S. 579, 595 (1993), the Supreme Courtobserved: Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.Id. (Citations and internal quotations omitted.) It is commonly said that a trial judge's decisionregarding the admissibility of expert testimony will not bedisturbed absent a clear abuse of discretion. See DaSilva v.American Brands, Inc., 845 F.2d 356, 361 (1st Cir. 1988). Thisformulation is adequate to our case which involves judgments ofbalancing and degree as to relevance, prejudice and the like. Itis useful to note, however, that admissibility of evidence issuescan also turn on abstract questions of law, where review is denovo, see United States v. Omar, 104 F.3d 519, 522 (1st Cir. 1997),or on findings by the judge of specific facts, where review is forclear error, see Mitchell v. United States, 141 F.3d 8, 17 (1stCir. 1998). In a product liability action, the burden of provingcausation rests on the plaintiff, but the defendant may--inaddition to disputing the plaintiffs' affirmative showing--presentevidence showing that some other cause accounts for the injury. Cf. Wilder v. Eberhart, 977 F.2d 673, 676 (1st Cir. 1992), cert.denied, 508 U.S. 930 (1993); Nickerson, 900 F.2d at 420. Ofcourse, a claim of alternative causation is not a free ticket toadmission of evidence; an alternative causation theory could beincoherent or irrational, or the evidence supporting itinadmissible. See Craig v. A.H. Robins Co., Inc., 790 F.2d 1 (1stCir. 1986). But a plausible theory of alternative causation,supported by admissible evidence, may be highly probative,particularly where the plaintiff's own theory of causation rests oninference or is otherwise open to debate. See Wilder, 977 F.2d at676-77; Swajian v. General Motors Corp., 916 F.2d 31, 34-35 (1stCir. 1990). This takes us to the evidence at hand. To be admissible,evidence must of course be relevant; it must meet specialrequirements if presented as expert testimony (e.g., the expertmust be qualified and the subject must be fit for experttestimony); and it can be excluded if its unfair prejudicialeffects substantially outweigh its probative value. See Fed. R.Evid. 401, 702, 403. We consider first whether the evidence inquestion was admissible apart from Rule 403 and then turn to theissue of undue prejudice. The first excluded evidence was the testimony of Dr.Jones. Dr. Jones would have testified at trial that in hisopinion, chlamydia caused Baker's PID, and he would have explainedthe reasons for his opinion. During voir dire outside of thepresence of the jury, Dr. Jones testified that he based his opinionon the fact that Baker had PID; that scientific studies reveal thatthe most common causes of PID are gonorrhea and chlamydia; thatBaker's PID was not of the acute kind caused by gonorrhea and therewas no evidence of gonorrhea; and that chlamydia was the mostcommon other cause of PID. He therefore offered his opinion to areasonable degree of medical certainty that chlamydia had causedBaker's PID and resulting injury.  Dr. Jones said that his opinion was reinforced by thefact that Baker's medical records revealed the presence oftrichomonas, a sexually transmitted disease, in 1972, because thepresence of one sexually transmitted disease tends to be correlatedwith the presence of others, such as chlamydia. He said thatBaker's specific medical injuries from PID were consistent withdamage caused by chlamydia. Finally, he testified that hisdiagnosis was strengthened by, but not dependent on, the 1996chlamydia titers that indicated Baker had been infected withchlamydia at some time. Baker has not challenged Dr. Jones'credentials as an expert or the suitability of the issue for experttestimony. Prejudice aside, the only remaining questions arewhether the testimony is "relevant" to an issue in controversy,Rule 401, and rests on scientific basis, Fed. R. Evid. 702;Daubert, 509 U.S. at 594-95. We start with the latter issue. Dr. Jones' testimony was based on a standard scientifictechnique, widely used in medicine, of identifying a medical"cause" by narrowing the more likely causes until the most likelyculprit is isolated. Of two very likely causes of PID, Dr. Joneseliminated one strong possibility (gonorrhea) because its symptomsare ordinarily more serious and no indication of gonorrhea wasfound. The other likely cause (chlamydia) he deemed more probablebecause Baker's symptoms were typical of this cause, she hadanother sexually transmitted disease in 1972 (there is somecoincidence of such diseases), and she showed antibodies in 1996indicating infection with chlamydia itself at some earlier time. Why this opinion should be regarded as "guesswork" orwithout "basis" (the district court's terms) is nowhere explainedeither by the judge or by Baker's brief on appeal. Dr. Jones'opinion rests on a scientific method, as required by Rule 702 asconstrued in Daubert, 509 U.S. at 592-95. Indeed, "differentialdiagnosis" is a standard medical technique. See, e.g., In re PaoliR.R. Yard PCB Litigation, 35 F.3d 717, 755 (3d Cir. 1994), cert.denied, 513 U.S. 1190 (1995). Baker has not argued that any of Dr.Jones' scientific premises (e.g., that chlamydia is a common causeof PID) was so faulty that it could not even be tendered to thejury for its consideration. Similarly, the testimony is self-evidently relevant tothe case at hand; it offers a scientific explanation directlypertinent to the central issue in the case, namely, whether theDalkon Shield IUD caused Baker's injury, see Fed. R. Evid. 401;Daubert, 509 U.S. at 591-92. Even allowing for the unlikely eventof dual causation, proof that chlamydia probably caused Baker's PIDobviously reduces the likelihood that the IUD did so. Dr. Jonescould only assert chlamydia as the cause to a reasonable degree ofmedical certainty, but little in diagnosis is certain, cf. Daubert,509 U.S. at 590, and Rule 401 merely requires that evidence make acontested fact more likely than it would be without the evidence(not "more likely than not"). Of course, Dr. Jones' opinion rests in some measure onhis view that the IUD could not have been the cause, but thedistrict judge himself agreed that that opinion was one for thejury to weigh. Nor is it of any importance that the juryimplicitly rejected this premise when it returned a verdict forBaker: the jury's own conclusion was reached without knowledge thatan alternative explanation existed. Further, even if one assumedthat the IUD could be an alternative cause, knowledge of analternative cause might have persuaded the jury that Baker had notproved her claim by a preponderance of evidence. Dr. Jones also relied on the 1996 titer tests showingchlamydia antibodies in Baker's blood. But while the admissibilityof the tests themselves as evidence presents a separate issue, Dr.Jones said that his ultimate opinion did not depend on the tests. Nor would exclusion of the tests from the jury's consideration haveprevented Dr. Jones from relying upon them in forming his ownopinion--although it might have led to limitations on histestimony--since the main criterion for the facts considered by theexpert is what is customary in the scientific community. See Fed.R. Evid. 703. The district court also excluded Dr. Minkin's testimonythat chlamydia was the likely cause of Baker's injury. Hertestimony was largely parallel to that of Dr. Jones, although shewas also prepared to say why Baker's PID symptoms did notcorrespond to symptoms that IUDs could cause and to address Baker'sapparent ectopic pregnancy in 1991. The district court's exclusionof Dr. Minkin's testimony seemingly depended on the same groundsgiven for excluding Dr Jones' testimony. We believe that theexclusion was in error for the reasons already stated. Because the district court also barred the Trust fromcross-examining Baker's expert, Dr. Stubblefield, on the issue ofchlamydia for similar reasons, we find this ruling was also inerror. The more difficult question is whether the 1996 titertests were admissible as evidence for consideration by the jury. These tests were the only targets of Baker's pretrial motion. Whenthe ruling on the motion was deferred, the district court shiftedattention to Dr. Jones' entire alternative-causation testimony ofwhich the 1966 titer tests were only a part. The tests appear tohave been excluded in the wake of the decision to exclude theexpert witness testimony, without which the titer tests would havemade no sense. On appeal, Baker adverts briefly (it would be too much tosay that the point is fully argued) to the notion that the testswere too remote in time, because they had occurred in 1996 and therelevant question was whether Baker's PID in the 1970s had beencaused by chlamydia. Although the district court did not rest onthis ground in excluding the evidence, the objection was raised byBaker in the district court in the in limine motion. It is alsolikely to recur in a retrial made necessary by the mistakenexclusion of the expert testimony. The proof that Baker had chlamydia at some point prior to1996 is obviously "relevant" under Rule 401 since it makes it morelikely than it would be without such evidence that she hadchlamydia in 1970 or 1975. Although the inference that Baker hadchlamydia during the 1970s is obviously weakened by the time gap,the titer tests were not the only basis for the inference: rather,they were one piece in a mosaic that included chlamydia as aprominent cause of the symptoms admittedly suffered by Baker, thecoincident presence of another sexually transmitted diseasediagnosed in 1972, and Dr. Jones' expert opinion that otherpossible causes of Baker's symptoms did not fit. Of course, the district court enjoys reasonablediscretion in determining whether evidence, although relevant,should be excluded because its probative value is "substantially"outweighed by the potential to confuse or mislead the jury. SeeShay, 57 F.3d at 132. Time disparities sometimes do lead to theexclusion of evidence on this ground. Cf. Fed. R. Evid. 609(excluding evidence of past convictions over ten years old). However, in this case the "confusion" risk is pretty limited sinceit would be relatively easy for Baker's counsel to cross-examine onthe issue and explain to the jury the significance of the timeinterval. Cf. Daubert, 509 U.S. at 596. This brings us to the final objection to both the experttestimony and the titer tests: Baker's claim that the evidence wasproperly excluded on the ground that its probative value wassubstantially outweighed by its likelihood of causing unfairprejudice to Baker. Fed. R. Evid. 403. Baker invoked this rubricin her in limine motion objecting to titer tests, and the districtjudge adverted to it generally. Whether it was an intended groundfor excluding any of the evidence is not perfectly clear, but it isargued to us on appeal, and we expressly reject it. On the probative value side of the balance, there is nodoubt whatever that the expert testimony, reinforced somewhat bythe titer tests, was quite important to the defense and hadsubstantial probative value if the defense experts were believed. It is all very well to say, as Baker does, that the defense is freeto assert that the IUD was incapable of causing PID, or at leastdid not cause it in this case. But the opportunity to offer oneline of evidence does not justify excluding a different,reinforcing line--and many would think that in this case thechlamydia theory was a more concrete and affirmative explanation asto why the defense should prevail. Cf. Wilder, 977 F.2d at 676;Swajian, 916 F.2d at 34-35. We recognize the unexplained attribution to a party of asexually transmitted disease could have some potential forprejudice. But in this case it would be easy to bring out oncross-examination that chlamydia is widespread, is easilycontracted and is not intrinsically a mark of promiscuity. In thiscontext, we see little indication of unfair prejudice from theevidence, let alone unfair prejudice "substantially" outweighingthe probative value of the expert and test evidence, as Rule 403requires. This case bears no resemblance to Craig v. A.H. RobbinsCo., Inc., 790 F.2d 1 (1st Cir. 1986). There, the evidenceexcluded was of multiple sexual partners offered simply to suggest an increased risk of infertility from non-IUD causes. Theprobative value of the testimony was limited; but, far moreimportant, the testimony was itself highly suggestive ofpromiscuity, presenting an entirely different situation. The final issue in the case is the Trust's challenge tothe district court's award of prejudgment interest. The Trustclaims that the award is inconsistent with a ruling of the federalbankruptcy court having jurisdiction over the plan ofreorganization under which the Trust was created. According to theTrust, the bankruptcy court has determined that prejudgmentinterest is not recoverable under the plan. In its answering brief, Baker agreed with the Trust thatthe issue should be resolved in accordance with the Fourth Circuitdecision reviewing the bankruptcy court's ruling. The FourthCircuit, we have just been told, has upheld the bankruptcy court. In re A.H. Robins Co., Inc., No. 98-1080 slip op. (4th Cir. Aug.31, 1998). We therefore treat the issue as resolved for purposesof this case by agreement of the parties. The judgment of the district court is vacated and thematter is remanded for a new trial consistent with this opinion. It is so ordered.