## IN THE MATTER OF A GRAND JURY INVESTIGATION.

Middlesex. April 4, 2002. - July 23, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Attorney at Law,* Attorney-client relationship. *Privileged Communication. Evidence,* Privileged communication. *Contempt. Abuse Prevention.*

In a grand jury proceeding seeking to determine whether a private school failed to comply with its mandatory duty under G. L. c. 119, § 51A, to report possible child abuse to the Department of Social Services, a Superior Court judge correctly concluded that neither the attorney-client privilege nor the work product doctrine attached to certain internal investigative reports of alleged student-on-student abuse that were prepared during the school's investigation, where teachers and officials at the school had an "affirmative obligation" under § 51A to report to the Department of Social Services when they had reason to suspect that a child under the age of eighteen years was suffering from abuse, and where none of the public policy interests that would be furthered by recognizing the attorney-client privilege or the work product doctrine would be advanced by attaching these privileges to the school's investigative documents. [349-356]

In a grand jury proceeding seeking to determine whether a private school failed to comply with its mandatory duty under G. L. c. 119, § 51A, to report possible child abuse to the Department of Social Services, a Superior Court judge did not, in the circumstances, abuse his discretion in considering the Commonwealth's ex parte affidavit to determine whether the Commonwealth had met its threshold burden of showing a factual basis adequate to support a reasonable belief that an in camera review of the evidence might establish that the "crime-fraud exception" applied to certain noninvestigative documents contended by the school to be privileged. [356-360]

This court vacated so much of a contempt judgment as required a private school to produce certain communications relating solely to three students who had disclosed their purported abuse by other students to school officials at a time when they were at least eighteen yeas of age, thus bringing them outside the purview of G. L. c. 119, § 51A, where the Commonwealth failed to prove that the "crime-fraud exception" applied to attorney-client communications regarding these victims because failure to report the abuse of these victims to the Department of Social Services was not a crime under § 51A; further, this court affirmed so much of the contempt judgment as applied to attorney-client communications concerning the school's internal investigation and to any other communications concerning the possible abuse of other children at the school who were under the age of eighteen years when the school learned of their allegations. [360-364]

MOTIONS filed in the Superior Court Department on August 1, 2000.

A proceeding for contempt was heard by *Charles M. Grabau,* J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Richard W. Renehan (Ellen C. Meyer* with him) for the school.

*Loretta M. Smith,* Assistant District Attorney *(Katharine B. Folger, Esther M. Bixler, & Afton M. Templin,* Assistant District Attorneys, with her) for the Commonwealth.

MARSHALL, C.J. A grand jury are investigating whether a private school failed to comply with its mandatory duty under G. L. c. 119, § 51A, to report possible child abuse to the Department of Social Services (department).[1] The case turns on whether the school violated § 51A by failing to report to the department allegations of the abuse of children who, when the school became aware of the alleged abuse, were under eighteen years of age.[2,3]

A grand jury subpoena duces tecum was served on the school

---

[1]General Laws c. 119, § 51A, provides, in relevant part: "Any . . . public or private school teacher [or] educational administrator . . . who, in his professional capacity shall have reasonable cause to believe that a child under the age of eighteen years is suffering physical or emotional injury resulting from abuse inflicted upon him which causes harm or substantial risk of harm to the child's health or welfare including sexual abuse . . . shall immediately report such condition to the [Department of Social Services] by oral communication and by making a written report within forty-eight hours after such oral communication . . . ."

[2]Section 51A mandates that teachers, school officials, and other identified professionals report allegations of child abuse to the Department of Social Services (department) where the victim is "under the age of eighteen years" at the time the mandated reporter becomes aware of the abuse. Mandated reporters have no duty to report allegations of abuse where the victim is older, no matter how serious the alleged abuse may be. *Id.* Such cases are the province of other government agencies. See 110 Code Mass. Regs. § 4.20(3) (2000) ("The Department sometimes receives reports of subject matter or events which clearly do not fall within the Department's mandate [i.e., abuse or neglect of children]. Examples include: reports of abuse of young adults [over age 18]").

[3]On August 1, 2000, a judge in the Superior Court impounded certain documents regarding the underlying motions to compel. On May 14, 2001, in anticipation of this appeal, the judge ordered all proceedings and filings in the case to be sealed and impounded nunc pro tunc as of August 1, 2000. Because this case is impounded, we designate the individuals and entities involved in

requesting production of eighty-five listed categories of documents "in any way pertaining to allegations of abuse at [the school] from September 1995 to the present."[4] The school refused to provide some of the subpoenaed documents on the grounds that they were shielded from production by the attorney-client privilege and the work product doctrine. The Commonwealth moved to compel production of the withheld documents and, while its motion was pending, moved for leave to file an ex parte prosecutor's affidavit in support of its application to apply the "crime-fraud" exception to the withheld documents. Under the crime-fraud exception, the attorney-client privilege does not extend to client communications "if the communication seeks assistance in or furtherance of future criminal conduct." See *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 114 (1997).

In three separate rulings in November and December, 2000, that reflect a careful analysis and attention to detail, the judge ordered the school to provide the Commonwealth with certain of the withheld documents. To permit an appeal from the motion judge's orders, the school continued to withhold most of the challenged documents, prompting the Commonwealth to file a complaint for contempt.[5] On January 17, 2001, a judgment of civil contempt entered against the school, from which the school timely appealed.[6] We transferred the case here on our own motion.

---

generic terms only, and discuss only such specific information as is consistent with our obligation to explain the basis of our decision.

[4]The school incorrectly characterizes the grand jury investigation as limited to the school's "51A reports" of March, 1999, regarding three alleged student victims, all of whom were at least eighteen years of age at that time. It is clear from the grand jury subpoena duces tecum, the judge's orders, and other evidence of record that the grand jury's investigation encompasses a much broader time frame and other alleged victims covered by the mandatory reporting statute. See *infra*.

[5]For purposes of this appeal, these documents correspond to the documents identified in the school's privilege log as numbers 16, 22 (as redacted by the judge), 27, 87, 88, 89, 92, 93 97, 104, and 105. The judge also found that the document identified in the school's privilege log as number 108 (as redacted by the judge) was not privileged.

[6]The judge imposed a civil fine of $1,000 per day for each day the school remains in contempt or until the term of the grand jury expires, but stayed the fines pending appeal from his orders.

We affirm the contempt judgment in part and vacate it in part. We determine, first, that the judge was correct to conclude that neither the attorney-client privilege nor the work product doctrine attaches to one class of disputed documents, the internal investigative reports of alleged student-on-student abuse that the school conducted in April, 1999.[7] As we explain in more detail below, these documents are not privileged in the circumstances of this case, where, among other factors, teachers and school officials were mandated by § 51A to report if they had "reasonable cause to believe" that abuse of a child under the age of eighteen years had occurred. G. L. c. 119, § 51A. None of the public policy interests that are furthered by recognizing the attorney-client privilege or the work product doctrine is advanced by attaching these privileges to the school's investigative documents.

The remaining disputed documents include investigation summaries, draft correspondence to third parties, and notes taken by the headmaster of conversations with the school's attorney (school's attorney) and, in some instances, with a public relations consultant (consultant) hired by the school. After reviewing a prosecutor's affidavit submitted ex parte by the Commonwealth, on December 18, 2000, the judge ordered some of the disputed noninvestigative documents produced pursuant to the "crime-fraud exception" to the attorney-client privilege. See *Purcell v. District Attorney for the Suffolk Dist.*, supra at 112-113. In a matter of first impression, we conclude that the judge's reliance on the allegations in the ex parte affidavit was not an abuse of discretion in the circumstances of this case.

We vacate so much of the contempt judgment as requires production of communications relating solely to three students, described more fully herein as victims one, two, and three, who disclosed their purported abuse to school officials at a time when they were at least eighteen years of age, thus bringing them outside the purview of § 51A. See G. L. c. 119, § 51A; 110 Code Mass. Regs. § 2.00 (1996). The Commonwealth has

[7]While some of these documents were subsequently produced, the school's internal investigation reports, those documents that correspond to the school's privilege log numbers 28-86, have never been produced to this court, or the Commonwealth, and form part of the basis of this appeal.

not met its burden of proving that the crime-fraud exception applies to attorney-client communications regarding these victims because, as the Commonwealth conceded at oral argument, failure to report the abuse of these victims to the department "is not a crime" under § 51A. See *Purcell* v. *District Attorney for the Suffolk Dist.*, *supra* at 114 ("the crime-fraud exception should apply only if the communication seeks assistance in or furtherance of future criminal conduct").

We affirm so much of the contempt judgment as applies to attorney-client communications concerning the school's internal investigation and to any other communications concerning the possible abuse of other children at the school who were under the age of eighteen years when the school learned of their allegations. Failure of the school to report possible abuse of those children might have violated § 51A. We remand the case to the Superior Court for further proceedings consistent with this opinion.

We turn now to the salient evidentiary background.[8]

# I

## A

The school is a private preparatory school. In early March, 1999, the school's headmaster was confronted in rapid succession with a series of disclosures about alleged student-on-student physical and sexual abuse. Specifically, on March 6 and 7, 1999, a boarding student at the school (victim one) told the headmaster that, two years earlier when he was sixteen, he had been sexually abused by other male students at the school. Victim one told the headmaster that the perpetrators had held him down, licked his face, groped him frontally and from behind, and digitally penetrated his rectum through his boxer

---

[8]Our background summary is drawn from evidence presented to the grand jury, as attested in the district attorney's ex parte affidavit, see *Matter of a Grand Jury Investigation*, 427 Mass. 221, 221-222, cert. denied sub nom. *A.R.* v. *Massachusetts*, 525 U.S. 873 (1998) (summarizing background facts as presented in testimony before grand jury); *In re Sealed Case*, 676 F.2d 793, 798 & n.1 (D.C. Cir. 1982) (same), as well as from supplemental uncontested testimony in the school's affidavits of record, and from other uncontested facts on the record as it appeared before the judge.

shorts. Victim one identified two other student victims by name (victim two and victim three, respectively) as well as five student perpetrators, two of whom were still students at the time of the disclosure. There is no evidence in the record to suggest that the headmaster or any other school teacher or official had previous knowledge of the attacks on victim one. On March 9, 1999, victims two and three separately came forward to the headmaster with allegations of similar abuse. Victims one, two, and three were all at least sixteen years of age when they were allegedly molested, and at least eighteen years of age at the date of their respective disclosures to the headmaster.

From the affidavit of the school's attorney, we glean the following. On March 7, 1999, a Sunday, the school's attorney received a telephone call from the headmaster "about allegations of sexual misbehavior between male students at the [school] that had occurred more than two years before and had just been brought to the Headmaster's attention."[9] The following day, at the headmaster's request, the school's attorney "reported the allegations" to the department. Shortly thereafter, the attorney received a telephone call from the department requesting additional information about the abuse allegations, which he obtained from an unnamed source and transmitted by telephone to the department that same day.[10] In mid-March, an attorney (victims' attorney), representing victims one and two, spoke with the school's attorney regarding his clients' allegations. On March 16, 1999, the school's attorney reported to the department "the supplemental information [he] had

[9]During the ensuing weeks, the headmaster had numerous communications with the attorney about the abuse allegations and "related topics." The headmaster considered these communications to be "privileged."

[10]Contemporaneously with this activity, the headmaster had separate conversations with two of the alleged student perpetrators, one of whom admitted that "wrestling" that involved groping was widespread at the school; however, the student described the wrestling as friendly in nature rather than assaultive. In early April, 1999, the headmaster informed one of these students by letter that, based on recent abuse allegations that two other students had made against him, including groping and grabbing of genitals and buttocks and, as described in the letter, "digital penetration made through clothing of the anal area," the headmaster had concluded that the student had violated "personal boundaries," and that future similar conduct would result in dismissal from the school.

recently received from" the victims' attorney "concerning the allegations of one of the students."

The school's attorney's affidavit is cursory, at best, providing no details about his conversations with the department, even though the school does not attempt to argue, nor could it, that any conversation between the attorney and the department fell within the school's attorney-client privilege.[11]

The details of the school's communications with the department are provided by the Commonwealth, albeit with a somewhat hazy chronology.[12] The Commonwealth maintains, in pertinent part, that, beginning in March, 1999, and during that "spring," the school's attorney had telephone conversations with the department, including its then general counsel. According to the Commonwealth, the school's attorney told the department of incidents that possibly involved some inappropriate touching while boys were lying atop boys. The school's attorney also told the department, among other things, that the incidents involved three male students who were all at least eighteen years of age when the school learned of their allegations and who had complained of "pig piles" involving the touching of crotches and genitals. The Commonwealth also claims that during these telephone conversations, the department discussed with the school's attorney the definition of sexual abuse, including sexual touching and penetration, and told the school's attorney that the boys were all too old to have information concerning their cases entered into the department computer for screening and possible action.[13] See G. L. c. 119, § 51B; 110 Code Mass. Regs. §§ 4.20(3),[14] 4.21 (2000).[15]

---

[11]In contrast, it is understandable that the headmaster's affidavits do not recount what he said to the school's attorney, for such disclosure would waive the very privilege the school seeks to assert.

[12]The school, although well aware of these specific representations almost from the inception of the grand jury proceedings, has neither refuted nor denied the Commonwealth's specific account of the conversations between the department and the school's attorney.

[13]At a discovery hearing in the grand jury matter, counsel for the department represented that, in 1999, it was the policy of the department not to log in reports of abuse occurring to persons over the age of eighteen.

[14]See note 2, *supra.*

[15]At no time, according to the Commonwealth, did the school's attorney

All parties agree that the school's attorney had his last substantive conversation with the department concerning victims one, two, and three some time before April 1, 1999, when the school began an internal investigation that we describe in the next section. One communication did occur on April 30, 1999, well after the internal investigation had concluded, when the school's attorney returned a telephone call from the department regarding a media inquiry to the department, the content of which is not apparent from the record. Nothing in the record suggests that during the April 30, 1999, conversation, the attorney and the department discussed the internal investigation, the results of the investigation, or any allegations of abuse of a child under the age of eighteen years. Thereafter, the school's attorney had no further communication with the department on behalf of the school. There is also nothing in the record to suggest that any teacher or school official communicated with the department.

### B

According to the affidavit of the school's attorney, by the end of March, 1999, he had become concerned about the school's possible criminal and civil exposure in the wake of claims by victims one, two, and three. He recommended to the headmaster that the school conduct what the judge characterized as "a broader, more systematic investigation of the allegations of sexual abuse." The aim of the inquiry, the school's attorney attested, was to "find out information with respect to any sexual improprieties committed against [the school's students], or their knowledge of any sexual improprieties committed against other students at the [s]chool." The school's attorney "advised the school as its legal counsel on the structure and method of the investigation and how to carry it out and the subjects to be explored." Both the attorney and the headmaster stated in their respective affidavits that they intended and believed the internal investigation to be privileged.

---

ever inform the department about digital penetration, skin-on-skin contact, the ages of the victims at the time they were molested, or the fact that some of the alleged perpetrators, as upper classmen, were now "prefects" at the school with a position of leadership over younger students.

The investigation began in early April, 1999, when students returned from spring break. At the instructions of the headmaster, each of the school's teachers interviewed his or her respective student advisees one-on-one about any "sexual improprieties" the students may have experienced or witnessed. Each teacher, on the headmaster's instructions, addressed his or her report of the interviews to the headmaster and the attorney and gave the report to the headmaster. Each teacher was told to keep the investigation confidential.

At about this time, a fourth victim (victim four) surfaced. Victim four disclosed to a school official that, two years previously, two of the perpetrators identified by victim one (one of whom was still at the school) had at different times grabbed his genitals. These alleged events occurred when victim four was fourteen years of age. He was sixteen years of age when he revealed the attacks, and thus within the jurisdiction of the department under G. L. c. 119, § 51A. Subsequently that same school official purportedly told victim four that she had spoken with the headmaster about his disclosures and that another student (victim five) had come to her claiming to have been abused at the school by other students.[16]

On April 15, 1999, when the school's internal investigation was largely complete, the school's attorney, the headmaster, a school trustee, the victims' attorney, and parents of two of the alleged victims met. At that meeting, the headmaster stated that the school had interviewed 299 students and that 280 of these students reported that they had not been abused and had not witnessed abuse at the school. Nothing in the record suggests that the school contacted the department concerning those nineteen students who presumably reported experiencing or seeing abusive behavior. The school never reported the results of its internal investigation to the department, nor did it report any allegations raised by victims four or five, or by students other than victims one, two, and three.

---

[16]There is nothing in the record concerning victim five's age or the specifics of his alleged abuse, and there is nothing in the record showing that the school has either affirmed or denied the Commonwealth's allegations about victims four or five.

## C

As the school's internal investigation progressed, the abuse allegations began to percolate in public. On April 6, 1999, victim one made a public announcement to a school assembly attended by hundreds of faculty, students, and prospective students and their parents in which he stated that repeated acts of serious sexual misconduct had occurred at the school.[17] This unexpected and startling public announcement prompted the headmaster to write a letter to alumni, parents, and others, in the headmaster's words, "explaining the [s]chool's response and plan of action."[18]

One year later, on February 24, 2000, for reasons not clear from the record, the headmaster sent a letter to the parents of boys who had graduated from the school in 1999, informing them that every student at the school (more than 300 boys and girls) had been interviewed by a faculty member, that the results of the investigation were reported to him and "reported again to the appropriate Massachusetts regulatory authority," and that the school's board of trustees had been informed of the investigation, the results, and the action taken by the school.

We now turn to the merits of the school's appeal.

## II

### A

The school does not contest that it has voluntarily withheld production of certain documents in violation of the judge's "clear and unequivocal" orders. See *Warren Gardens Hous. Coop. v. Clark*, 420 Mass. 699, 701 (1995), quoting *United Factory Outlet, Inc. v. Jay's Stores, Inc.*, 361 Mass. 35, 36 (1972). Nor does it contest the imposition of a fine for civil contempt.

---

[17]Victim one told the gathering that a series of "homosexual rapes and molestations" had occurred at the school, and that several of the "rapists and molesters" remained at the school and were in charge of younger students.

[18]Shortly thereafter the school hired the consultant to handle media inquiries about the case. The consultant agreed not to disclose any information to the media without the prior authorization of the attorney and the headmaster. As the abuse claims gained public notoriety, the consultant fielded numerous media requests on behalf of the school.

Rather, on appeal the school attacks the judge's findings of fact and rulings of law in the underlying discovery orders on which the contempt judgment rests. In essence, the school raises three broad challenges. First, the school argues that the judge erred in finding the internal investigation documents not privileged. In a two-pronged attack, the school also challenges the judge's application of the crime-fraud exception to certain privileged documents. The school claims that the judge erred in relying on the Commonwealth's ex parte affidavit to support the application of the crime-fraud exception. Further, the school claims that the judge erred in concluding that the crime-fraud exception applied in the circumstances of this case. We address these points seriatim, reviewing the contempt judgment's rulings of law de novo and its findings of fact under the "clearly erroneous" standard. *Demoulas* v. *Demoulas Super Mkts., Inc.,* 424 Mass. 501, 510 (1997), *S.C.,* 428 Mass. 543 (1998).

B

The school continues to withhold fifty-nine separate documents, most no longer than one page, concerning its internal investigation. Each document is described in the school's privilege log as "[f]aculty report of meeting with student advisees."[19] Relying on *Upjohn Co.* v. *United States,* 449 U.S. 383 (1981), the school claims that these documents are protected by the attorney-client privilege and the work product doctrine

[19]Ten of the reports are undated, and the rest bear dates between early and mid-April, 1999 — that is, after the school's attorney had his last substantive communication with the department. With one exception, all of the reports appear on the school's privilege log as having been addressed to and received by only the attorney and the headmaster. The school has represented that the documents correspond to two requests in the subpoena duces tecum to the school: (1) documents concerning "[c]onversations, interviews and meetings between [the school's] faculty, teachers and/or administrators and the other 19 unnamed students referred to during [an] April 15, 1999, meeting" between the attorney, the headmaster, a trustee of the school, the victims' attorney, and the parents of two of the victims; and (2) documents concerning "[c]onversations, meetings and/or correspondence between and among [the headmaster, a trustee of the school, the school's] Board of Trustees or its committees, [school] faculty, [the attorney and the attorney's law firm], parents of [the school's] students, and students of [the school] regarding reports, written and/or oral to [the department] [of] any allegations of abuse at [the school] from September 1995 to present . . . ."

as applied to internal corporate investigations. We first consider the school's claims of attorney-client privilege as it pertains to the internal investigation.

The attorney-client privilege is among the most hallowed privileges of Anglo-American law. *Id.* Our earliest opinions described the privilege as "very well established." *Foster* v. *Hall*, 12 Pick. 89, 93 (1832). The privilege fosters compliance with the law by "encourag[ing] clients to seek an attorney's advice and to be truthful with the attorney, which in turn allows the attorney to give informed advice; the attorney-client privilege [thus] serves the public interest and the interest of the administration of justice." *Commonwealth* v. *Goldman*, 395 Mass. 495, 502, cert. denied, 474 U.S. 906 (1985). See *Matter of a John Doe Grand Jury Investigation*, 408 Mass. 480, 482-483 (1990).

Considerable public benefit inures when an institution voluntarily scrutinizes its own operations for the purpose of seeking advice from counsel on how to comply with the law, particularly where today's increasingly dense regulatory terrain makes such compliance "hardly an instinctive matter." *Upjohn Co.* v. *United States, supra* at 392. Compliance with the law begins with a frank disclosure of the facts to the attorney. The "first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant." *Id.* at 390-391.

A construction of the attorney-client privilege that would leave internal investigations wide open to third-party invasion would effectively penalize an institution for attempting to conform its operations to legal requirements by seeking the advice of knowledgeable and informed counsel.[20] In this case, however, we need not resolve all of the difficult issues involved concerning whether and to what extent an attorney's involvement in internal investigations renders such communications subject to the attorney-client privilege. For unquestionably the

---

[20]"Courts protect adverse information in the hands of counsel because counsel needs both favorable and adverse news to devise a strategy. It is not possible to separate adverse from favorable information in advance; a client, knowing this, would find disclosures of all sorts more costly if there were no privilege" (citation omitted). *Matter of Feldberg*, 862 F.2d 622, 627 (7th Cir. 1988).

attorney-client privilege may conflict with a different public policy where the Legislature has determined that an institution *must* disclose certain information to others. Here, it is clear on the record that under any reasonable view of the attorney-client privilege, the school's internal investigation documents are not protected.

"The essence of the [attorney-client] privilege is that it is recognized only to protect the confidential relation between attorney and client.. Communications that are intended to be conveyed to others are not privileged." P.J. Liacos, Massachusetts Evidence § 13.4.5, at 783 (7th ed. 1999). See *Matter of the Reorganization of Elec. Mut. Liab. Ins. Co. (Bermuda)*, 425 Mass. 419, 421 (1997); *Foster* v. *Hall, supra* at 98. Only those facts that a client has "a right to keep secret" from others are shielded from third-party view when communicated to an attorney. *Matter of a John Doe Grand Jury Investigation, supra* at 482, quoting *Hatton* v. *Robinson*, 14 Pick. 416, 422 (1833).

A quintessential element of the attorney-client privilege — the expectation of confidentiality in the results of the investigation — is absent in this case. The teachers and school officials involved in the internal investigation knew, or should have known, that they would have no "right to keep secret" any information disclosed by the internal investigation concerning possible abuse victims under the age of eighteen years. The plain language of § 51A leaves no uncertainty that mandated reporters have an "affirmative obligation" to report to the department when they have reason to suspect that a child under the age of eighteen years is suffering from abuse or neglect. *Cobble* v. *Commissioner of the Dep't of Social Servs.*, 430 Mass. 385, 386 n.2 (1999). See G. L. c. 119, §. 51A (statutorily mandated reporter, acting in professional capacity, must report to the department whenever he or she has "reasonable cause to believe" that child "is suffering physical or emotional injury resulting from abuse inflicted upon him which causes harm or substantial risk of harm to the child's health or welfare including sexual abuse, or from neglect").[21] While it has been held that mandated reporters have some discretion to winnow out

---

[21]The department defines "emotional injury" as "an impairment to or disorder of the intellectual or psychological capacity of a child as evidenced

complaints that are patently outside the scope of the statute, see *Mattingly* v. *Casey*, 24 Mass. App. Ct. 452, 456 (1987), but see note 22, *infra*, that discretion, assuming it exists, is extremely modest in the context of reporting child abuse. A "presentation of facts which create a *suspicion* of child abuse is sufficient to trigger the [reporting] requirements of § 51A" (emphasis added). *Care & Protection of Robert*, 408 Mass. 52, 63 (1990).[22]

Each of the school's teachers, as well as the headmaster, was required to bring to the attention of the department any arguably reasonable suspicion he or she had that a child under the age of eighteen years was suffering from abuse. As mandated reporters, these individuals were not permitted to weigh the credibility of witnesses, sift the evidence, or determine whether the department would find reasonable cause to conclude that abuse did in fact occur. The Legislature has entrusted such judgments to the department. See G. L. c. 119, § 51B. Instead, from the inception of the internal investigation, and regardless of what was said by and to the school's attorney, the headmaster and his teachers knew, or should have known, that § 51A required them to report possible child abuse "immediately" on learning of it. G. L. c. 119, § 51A. They knew, or should have known, that they were required to lodge their reports in painstaking detail. *Id.* They knew, or should have known, that they would be immune from any civil and criminal liability for reporting otherwise confidential information pursuant to their duties under § 51A, and that failure to make their mandatory reports was a crime.[23] *Id.* Cf. *Hope* v. *Landau*, 21 Mass. App. Ct. 240, 243 (1985), *S.C.*, 398 Mass. 738 (1986).

---

by observable and substantial reaction in the child's ability to function within a normal range of performance and behavior." 110 Code Mass. Regs. § 2.00 (1996).

[22]*Care & Protection of Robert*, 408 Mass. 52, 63 (1990), and *Mattingly* v. *Casey*, 24 Mass. App. Ct. 452 (1987), were decided when § 51A required the reporting of only "serious" abuse. The statute was amended by St. 1993, c. 50, § 23, approved May 20, 1993, to remove the word "serious" before the phrase "physical or emotional injury." See note 1, *supra*. The amendment evinces the Legislature's intent that mandated reporters are required to report whenever there is "reasonable cause to believe" there has been abuse of children under the age of eighteen years and not to attempt to weigh the seriousness of the abuse allegations.

[23]The stringent reporting requirements and the protections the statute accords mandated reporters further the Legislature's intent to protect children

We need not and do not decide whether an internal investigation of possible child abuse may be protected from disclosure by the attorney-client privilege if it uncovers *no* conceivable reportable abuse. Here, the Commonwealth has demonstrated a reasonable basis for concluding that the school's internal investigation may have yielded reportable information about harm to children. Specifically, the record discloses that victim four, who was sixteen years old at the time of his disclosure, may have been subjected to abuse — that is, unwanted sexual touching — that the school was mandated by § 51A to report. Additionally, the school's own representations to third parties in April, 1999, disclosed that the internal investigation found that 280 of 299 students had reported that they neither witnessed nor experienced abusive behavior. The district attorney quite properly asks: What about the other nineteen students?

Also relevant is that the school touted its internal investigation to the public in an effort to explain and defend its actions. The school had every right to do this. But it cannot rely on an internal investigation to assert the propriety of its actions to third parties and simultaneously expect to be able to block third parties from testing whether its representations about the internal investigation are accurate. See *United States* v. *Massachusetts Inst. of Tech.*, 129 F.3d 681, 686 (1st Cir. 1997) (disclosure to third party normally negates attorney-client privilege). Cf. *Peters* v. *Wallach*, 366 Mass. 622, 627-628 (1975).[24]

The school's reliance on *Upjohn Co.* v. *United States, supra,* is misplaced.[25] There the Court, among other things, upheld a company's claim of attorney-client privilege for certain docu-

from physical and emotional damage at the hands of the persons in whose care they are entrusted. See G. L. c. 119, § 1; 110 Code Mass. Regs. § 4.21 and commentary (2000).

[24]Because we hold that, on the facts of this case, the attorney-client privilege does not exist with respect to the school's internal investigation documents, we need not consider whether a privilege was waived with respect to those documents. See *Darius* v. *Boston*, 433 Mass. 274, 277-279 (2001) (discussing waiver of attorney-client privilege); *Commonwealth* v. *Goldman*, 395 Mass. 495, 500 & n.6, cert. denied, 474 U.S. 906 (1985), and cases cited ("[a] waiver may be found . . . where the client testifies as to the content of a privileged communication").

[25]We have often cited with approval the broad language of *Upjohn Co.* v. *United States*, 449 U.S. 383 (1981), concerning the underlying purpose of the

ments related to an internal corporate investigation. The investigation was conducted of and by company employees, at the direction and under the supervision of counsel. *Id.* at 386-387. Upjohn's internal investigation was initiated to protect the corporation from possible harm caused by its own employees. *Id.* at 391. Here, the school's internal investigation was undertaken to uncover possible harm to students whom the school had a legal obligation to protect from harm by mandatory reporting. The *Upjohn* case does not concern the charge that the company may have used its internal investigation to evade its reporting obligations. This case does.

In concluding that the school must produce the internal investigation documents, we are mindful of our duty to preserve the Legislature's prerogative to mandate the disclosure of information, however delicate or private, whose airing it deems necessary for the public good. In recent years, the Legislature has imposed mandatory reporting requirements on those who care for the elderly and the disabled, as well as those who care for children. See G. L. c. 19C, § 10 (mandatory reporting of abuse of disabled); G. L. c. 19A, § 15 (mandatory reporting of elder abuse). To protect the public weal, it has imposed mandatory reporting requirements in a raft of legislation outside the area of abuse prevention. See, e.g., G. L. c. 21I, § 10 (mandatory reporting by "large quantity toxics users"); G. L. c. 55 (mandatory reporting of financial information by candidates, political parties, and political action committees); G. L. c. 62C, § 8 (mandatory reporting to Commissioner of Revenue by entities doing business in Commonwealth); G. L. c. 94, § 307B (mandatory reporting by manufacturers of cigarette, snuff, and chewing tobacco). Mandatory reporting is, in short, a consistent feature of the modern administrative State. The Legislature's legitimate interest in mandating the disclosure of certain information would be eviscerated if we were to place outside the bounds of the discovery process the investigative activities of mandated reporters related to their reporting obligations.

---

attorney-client and work product privileges. E.g., *Commonwealth v. Bing Sial Liang*, 434 Mass. 131, 138 (2001); *Shine v. Vega*, 429 Mass. 456, 469 (1999); *Judge Rotenberg Educ. Ctr. Inc. v. Commissioner of the Dep't of Mental Retardation (No. 1)*, 424 Mass. 430, 457 n.26 (1997) (distinguishing *Upjohn*); *Commonwealth v. Goldman, supra* at 502.

We need not dwell on the school's claim that the internal investigation documents are "fact work product" protected by the work product doctrine, see *In re Grand Jury Subpoena (Zerendow)*, 925 F. Supp. 849, 853-854 (D. Mass. 1995) (distinguishing "opinion" work product from "ordinary" work product), because it does not contend that the reports contain the attorney's mental impressions, conclusions, opinions, or legal theories, see Mass. R. Civ. P. 26 (b) (3), as appearing in 365 Mass. 772 (1974), and Mass. R. Crim. P. 14, 378 Mass. 874 (1979), and because the school was mandated by § 51A to disclose to the department all facts concerning any reportable abuse uncovered by its internal investigation.[26]

## C

After filing a motion to apply the crime-fraud exception to certain documents listed on the school's privilege log, the Commonwealth moved for leave to file an ex parte prosecutor's affidavit. The Commonwealth argued that submission of the affidavit ex parte was necessary to allow it to make its threshold evidentiary showing and to meet its burden of proof under *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109, 113 (1997). The judge did not abuse his discretion in relying on the Commonwealth's ex parte affidavit in considering whether to apply the crime-fraud exception to the school's privileged documents.[27]

In the *Purcell* case, *supra* at 114, we held that the attorney-client privilege does not extend to client communications that

---

[26] Our holding makes it unnecessary to address the school's theory that Mass. R. Crim. P. 5, 378 Mass. 850 (1979), provides broader protection of "fact" work product than does Mass. R. Crim. P. 14 (a) (5), 378 Mass. 874 (1979), which opens such work product to discovery.

[27] In his November 20, 2000, order the judge determined that "to properly serve the public interest in protecting a child's welfare as well as the interest for confidentiality," he would view the documents in camera to determine whether to apply that exception. The basis of the judge's determination to view the attorney-client communications documents in camera is not entirely clear, because he concluded, somewhat ambiguously, that the fact that the school deputized its attorney to report to the department meant that the school "cannot now attempt to shield itself by asserting the attorney-client privilege." As we discuss *infra*, the crime-fraud exception only applies where a document is first found to be privileged. Because the Commonwealth has not challenged the school's contention that the documents are subject to the attorney-client

seek "assistance in or furtherance of future criminal conduct." No public interest is served by permitting a client to use the attorney-client privilege to help him or her break the law. *Id.* at 112.[28] But we cautioned that the crime-fraud exception is a narrow one. Unless the crime-fraud exception applies, the attorney-client privilege may not be invaded, even where the communication concerns possible future criminal conduct, "because an informed lawyer may be able to dissuade the client from improper future conduct, and, if not, under the ethical rules may elect in the public interest to make a limited disclosure of the client's threatened conduct."[29] *Id.* at 116. The party invoking the crime-fraud exception must prove by a preponderance of the evidence that the exception applies. *Id.* at 113. At the judge's discretion, that party may request the judge's in camera inspection of the disputed evidence by making a threshold evidentiary showing of "a factual basis adequate to support a reasonable belief that an in camera review of the evidence may establish that the [crime-fraud] exception applies." *Id.* However, because even ex parte review of the evidence invades the attorney-client privilege, a judge must not summarily grant such a request. *Id.* at 114.

While we have not previously had occasion to consider the use of ex parte government affidavits to prove the applicability of the crime-fraud exception under the *Purcell* case,[30] such affidavits have been used in Federal courts for some time where

---

privilege, we need not address any factual discrepancy between the hearing judge's November and December orders.

[28]The crime-fraud exception also applies to materials otherwise protected by the work product doctrine, see *Craig* v. *A.H. Robins Co.*, 790 F.2d 1, 4 (1st Cir. 1986), but the judge's rulings on the crime-fraud exception concern only the attorney-client privilege.

[29]The restricted scope of the crime-fraud exception applies in both the criminal and the civil contexts to protect a client's candid communications with an attorney against incursions by third parties. See *Matter of Ellis*, 425 Mass. 332 (1997); *Purcell* v. *District Attorney for the Suffolk Dist.*, 424 Mass. 109 (1997).

[30]The practice of reviewing ex parte submissions from the Commonwealth in the context of grand jury proceedings is not unknown in our courts. See, e.g., *WBZ-TV4* v. *District Attorney for the Suffolk Dist.*, 408 Mass. 595, 598 (1990) (noting that, in connection with grand jury proceeding, "a judge in the Superior Court accepted and read in camera a memorandum submitted by the district attorney detailing reasons why disclosure of the witness statement would compromise the ongoing grand jury investigation").

grand jury proceedings are at issue. See *United States* v. *Lilly,* 185 F.R.D. 113, 114 (D. Mass. 1999); *In re Grand Jury Subpoena (Legal Servs. Ctr.),* 615 F. Supp. 958, 967 (D. Mass. 1985) ("ex parte affidavits and in camera submissions are common devices in the context of grand jury investigations"). Although sealed affidavits generally "are a disfavored means of offering testimony," *United States* v. *Lilly, supra* at 114, Federal courts have relied on such evidence when necessary to protect the secrecy of ongoing grand jury proceedings.[31] See *In re Grand Jury Subpoena,* 223 F.3d 213, 216 (3d Cir. 2000). These courts have required that the ex parte affidavit be the fruit of the grand jury's work rather than of the prosecutor's independent investigation. See *In re Grand Jury Subpoena (Legal Servs. Ctr.), supra* at 966, quoting *In re September 1971 Grand Jury,* 454 F.2d 580 (7th Cir. 1971), rev'd on other grounds, *United States* v. *Meara,* 410 U.S. 19 (1973) (judge may consider ex parte affidavit that "does not bear the imprint of the [g]rand [j]ury's independent initiative"); *United States* v. *Lilly, supra* at 115. Moreover, they have required that an ex parte affidavit must be considered in light of all of the circumstances, including the factual and legal soundness of the underlying subpoena. *In re Grand Jury Subpoena, supra* at 219.

Here, the subpoena was reasonably tailored to the scope of the grand jury's investigation. The hearing transcripts show that the judge carefully considered the entire context of the grand jury proceedings in deciding to review the affidavit, and that he appropriately weighed the importance of maintaining the grand jury's secrecy against the competing interests protected by the attorney-client privilege. Our independent review of the affidavit reveals that its allegations largely, although not

---

[31]Secrecy is integral to the grand jury's function as an investigative body convened "to inquire into all information that might possibly bear on its investigation until it has identified an offense or satisfied itself that none has occurred." *Matter of a Grand Jury Investigation,* 427 Mass. 221, 226 (1998), quoting *United States* v. *R. Enters. Inc.,* 498 U.S. 292, 297 (1991). Secrecy protects innocent people from the stigma of criminal indictment, "protect[s] witnesses from intimidation and subornation," and secures the free disclosure of information and candid deliberations. *WBZ-TV4* v. *District Attorney for the Suffolk Dist., supra* at 600. See *United States* v. *John Doe, Inc. I,* 481 U.S. 102, 109 n.5 (1987). See also Mass. R. Crim. P. 5 (d), 378 Mass. 874 (1979) (prosecutors required to maintain secrecy of grand jury proceedings).

completely, "bear the imprint" of the grand jury's inquiry. Moreover, admitting the affidavit under seal is necessary to protect the secrecy of the grand jury's ongoing investigation of the school, as well as to protect the privacy interests of the minor victims who allegedly suffered sexual abuse. Reviewing these facts as a whole, we cannot say that the judge abused his discretion in considering the government's ex parte affidavit to determine whether the government has met its threshold burden of showing "a factual basis adequate to support a reasonable belief that an in camera review of the evidence may establish that the [crime-fraud] exception applies." *Purcell* v. *District Attorney for the Suffolk Dist., supra* at 113.

Nor were the school's due process rights impermissibly curtailed by the judge's consideration of the ex parte government affidavit.[32] The Commonwealth asserts, and the record supports, that the school has long known of the basis for the Commonwealth's claims. The Commonwealth provided considerable information about the underlying factual basis of its motion to apply the crime-fraud exception in numerous discovery motions and in oral argument, to all of which the school had ample opportunity to respond. See *In re Antitrust Grand Jury*, 805 F.2d 155, 162 (6th Cir. 1986). Moreover, nothing in the record suggests that the school requested that the judge consider any ameliorative measures short of disclosing or rejecting the entire affidavit. See, e.g., *In re Grand Jury Subpoena, supra* at 219 (court that questions sufficiency of government's ex parte submissions "has available various avenues of inquiry, among them discovery, in camera inspection, additional affidavits and a hearing"); *In re Antitrust Grand Jury, supra* at 160-161 (discussing circumstances in which party opposing use of in camera information from grand jury investigation may successfully seek disclosure of that information). See generally Gray, A Defense Lawyer's Nightmare: Litigating the Crime/Fraud Exception, Bus. Crimes Bull.: Compliance and Litigation, January, 2002, at 8. The school

---

[32]The majority of Federal Circuit Courts of Appeal that have considered the matter have held that a judge's reliance on the government's ex parte affidavits to determine that the crime-fraud exception applies does not violate the opposing party's due process rights. See *In re Grand Jury Subpoena*, 223 F.3d 213, 219 (3d Cir. 2000) (discussing and collecting cases).

chose to take an all-or-nothing approach on the issue of the sealed affidavit. The judge was well within his discretion to reject that approach. In reaching our conclusion, we have not relied on any information of which the school is unaware.[33] That the school has chosen to leave significant allegations and arguments unchallenged is no basis to ascribe reversible error to the judge.

We now turn to the substance of the school's argument that the crime-fraud exception should not apply to its privileged documents.

### D

In ruling on the applicability of the crime-fraud exception, the judge did not specify how the exception applied to the Commonwealth's legal theories about the school's allegedly unlawful activity. To avoid further litigation on this point, and to clarify our holding for future cases, we address this issue as a preliminary matter.

Among other things, the Commonwealth asserts that the crime-fraud exception applies to the disputed attorney-client communications and draft correspondence insofar as these documents have bearing on whether the school, by deliberately downplaying the severity of the abuse suffered by victims one, two, and three, violated § 51A. The Commonwealth further asserts that by making misleading or incomplete reports of the allegations, the school unlawfully deceived the department and thwarted its investigative role. See G. L. c. 119, § 51A. We disagree. Had victims one, two, and three come forward with their allegations prior to their eighteenth birthdays, the Commonwealth's charges might well have force. But all three of these students disclosed their plight to the headmaster *after* they turned eighteen years old, and thus they stood outside of the jurisdiction of the department under § 51A when the school first learned about what had happened to them. At oral argument, the Commonwealth conceded that it "was not a crime" under § 51A for the school not to have reported the sexual and physical harassment of victim one. Its concession applies with

---

[33]The ex parte affidavit, for example, quotes extensively from documents written or received by the school and thus well within the school's ken.

equal force to victims two and three. Nothing in the record indicates that these victims disclosed their molestation to the headmaster, or that the school knew of it, prior to their turning eighteen years old.

Because the school had no statutory duty to inform the department about what had happened to victims one, two, and three, over whom the department had no jurisdiction, it follows that the school cannot be culpable for failing to provide a detailed account of these students' allegations to the department, assuming for the moment that such omissions occurred. Without evidence of a crime or fraud, the crime-fraud exception is inapplicable. *Purcell* v. *District Attorney for the Suffolk Dist.*, *supra* at 112.[34] Even if the school's attorney were its mere "agent" in communicating with the department about victims one, two, and three, the fact remains that the Commonwealth's legal theory is fatally deficient regarding the school's liability under § 51A as to those victims.

To the extent that the privileged documents concern the school's internal investigation and any facts that the investigation may have turned up regarding reportable abuse, or to the extent that the documents suggest, as they do, the school's awareness of evidence of abuse of students who were, at the time that the school learned of the abuse, under the age of eighteen years, then the crime-fraud exception may apply to defeat the school's attorney-client privilege. As we noted above, the internal investigation took place after the school's attorney spoke with the department about victims one, two, and three. The Commonwealth alleges, and the school does not refute, that in his conversations with the department, the school's attorney was explicitly given information, which the school in any event should have known, that forced restraint, genital grabbing, and other unwanted touching of a sexual nature are well within the umbrella of reportable abuse under § 51A. See, e.g., G. L. c. 265, § 13A (assault and assault and battery); G. L. c. 265,

---

[34]Our holding today makes it unnecessary for us to consider the school's arguments that § 51A confers immunity on the school's attorney from criminal and civil liability for reporting to the department concerning victims one, two, and three. We also need not consider whether the school's attorney's communications with the department constitute "reports" within the meaning of § 51A.

§ 13B (indecent assault and battery on child under age of fourteen years). The school's teachers and officials, as mandated reporters, also should have known at the time of the investigation that forced anal penetration of a minor, if proved, amounts to criminal rape. See, e.g., G. L. c. 265, § 22A (rape of child under age of sixteen years); G. L. c. 265, § 23 (rape of child). The Commonwealth has presented credible evidence that the school did learn of such abuse during the course of its investigation, and that at least one alleged victim (and possibly many more) was under the age of eighteen years at the time of disclosure and thus within the jurisdiction of § 51A.

The school's knowledge of such reportable abuse, however, does not in itself trigger the crime-fraud exception. The school "owns" its attorney-client privilege and can be ordered to relinquish that privilege involuntarily only in the most narrow of circumstances. See generally P.J. Liacos, Massachusetts Evidence §§ 13.4.6 & 13.4.7, at 784-788 (7th ed. 1999). For the crime-fraud exception to extinguish the attorney-client privilege, the Commonwealth must demonstrate by a preponderance of the evidence that the school sought or intended to use its attorney's advice to evade its mandatory reporting obligations in violation of § 51A. *Purcell* v. *District Attorney for the Suffolk Dist., supra* at 113. The determining factor is not the attorney's intention or actions; for purposes of analyzing the crime-fraud exception, the attorney's conduct and motive is irrelevant. What matters is whether the school, as holder of the attorney-client privilege, used or tried to use the cover of that privilege to "seek[] assistance in or furtherance of future criminal conduct." *Id.* at 114.[35]

In the circumstances of this case, the Commonwealth has met

---

[35]See *Matter of Ellis*, 425 Mass. 332, 336-337 (1997); *Commonwealth* v. *Kiley*, 373 Mass. 454, 462 (1977); *Commonwealth* v. *Dyer*, 243 Mass. 472, 505-506 (1922), cert. denied, 262 U.S. 751 (1923). See also *Ferrara & DiMercurio, Inc.* v. *St. Paul Mercury Ins. Co.*, 173 F.R.D. 7, 12-13 (D. Mass. 1997) (applying Massachusetts law post-*Purcell* to distinguish *United States* v. *United Shoe Mach. Corp.*, 89 F. Supp. 357, 358-359 [D. Mass. 1950], by holding crime-fraud exception inapplicable to intentional torts). The attempt to conceal that which the law requires to be reported itself may constitute a crime, even if the reportable offense concerns a past, not present or future, crime. See *Matter of Ellis, supra* at 341 (concealment of fraud and improper claims practices). See also *In re Grand Jury Subpoena (Zerendow)*,

its burden under the *Purcell* case. The record discloses the following probative evidence: The school knew, or should have known, that victim four's allegations were serious. It knew, or should have known, that it was mandated to report victim four's abuse under § 51A. The school consulted with its attorney concerning the allegations of abuse it learned about in April, 1999, which included, at a minimum, victim four's allegations of unwanted genital grabbing and the abuse of victim five. The record is silent about what the school told its attorney. But the school did not report to the department victim four's allegations, or the allegations concerning victim five, or the allegations of perhaps nineteen other students whom the school's internal investigation revealed to have either experienced or witnessed abuse. Moreover, the record discloses that the school may have resorted to the cover of the attorney-client privilege to obscure its responsibility for not reporting that information uncovered during the internal investigation, mischaracterizing its actions and downplaying the nature of the uncovered abuse to the public. Taken together, this evidence suffices to meet the Commonwealth's burden under the *Purcell* case.

Throughout the proceedings before the judge and in this appeal, the school has maintained a dogged silence with regard to what it knew about victim four, victim five, and perhaps nineteen other alleged abuse victims under the age of eighteen years. The school's silence is inexplicable in light of its vigorous, factually detailed defense of its actions regarding victims one, two, and three. The school's silence regarding the abuse of victims four, five, and perhaps others uncovered by its own internal investigation has helped the Commonwealth make its case about these alleged victims and the school's internal investigation.

We have reviewed the judge's discovery orders for whether, among other things, he improperly applied the crime-fraud exception to documents concerning victims one, two, and three that are protected by the attorney-client privilege. We have determined that the judge should not have ordered the school to produce the documents identified on the school's privilege log

925 F. Supp. 849, 856 (D. Mass. 1995); J. W. Gargacz, Attorney-Corporate Client Privilege §§ 4.36-4.37 (3d ed. 2001 & Supp. 2001).

as document no. 87, corresponding to Bates stamp nos. GP00109-GP00110, and document no. 88, corresponding to Bates stamp no. GP00111, because the crime-fraud exception does not apply to these privileged communications. We affirm the judge's contempt judgment regarding the remainder of the attorney-client communications, which consist of the headmaster's summaries of the school's internal investigation and notes taken by the headmaster of conversations with the school's attorney. These notes were written well after the school began its internal investigation and learned of the possible sexual molestation of at least one student under the age of eighteen years and possibly many more students. These attorney-client documents are identified by the number on the school's privilege log and parenthetically by Bates number as follows: document no. 16 (GP00027-GP00033), document no. 22 (GP00041, as redacted by the judge), document no. 27 (GP00048), document no. 97 (GP00130-GP00132), document no. 104 (GP00157), and document no. 105 (GP00158-GP00159).

We also affirm the contempt judgment concerning the draft correspondence to third parties that was authored either by the school's attorney or jointly by the school's attorney, the headmaster, and the consultant.[36] These are document no. 89 (GP00112), document no. 92 (GP00115-GP00116), and document no. 93 (GP00117-GP00119).

Finally, we affirm the finding of the judge that document no. 108 (GP00164), as redacted by the judge, a transmittal memorandum, must be produced because this document is not protected by either the attorney-client privilege or the work-product doctrine.

On the facts of this case, the judge did not err in concluding that the school's internal investigation documents were not privileged and that, under the crime-fraud exception, the grand jury should have access to certain privileged documents to determine whether the school violated its mandatory reporting obligation under § 51A with respect to children under eighteen years of age.

---

[36]Because the Commonwealth did not appeal from the judge's determination that draft documents created by the school, the attorney, and the consultant are privileged, we need not and do not decide whether these communications are properly within the attorney-client privilege.

## III

For the reasons set forth above, we vacate the contempt judgment in part, affirm it in part, and remand the case to the judge for further proceedings consistent with this opinion.

*So ordered.*